UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:22-cr-00082 (JMC)** |
| **v.** | : | |
| | : | |
| **CHRISTOPHER W. ORTIZ,** | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence the defendant, Christopher W. Ortiz, to 5 months' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.

I.     **Introduction**

On January 6, 2021, Christopher W. Ortiz, then a 27-year-old resident of Huntington, New York, participated in the attack on the United States Capitol – a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars in losses.[1]

On March 24, 2022, Ortiz pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): parading, demonstrating, or picketing in the Capitol Building.  As explained herein, a sentence of 5 months' imprisonment, with probation to follow, is appropriate in this case because: (1) the

---

[1]     As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

defendant unlawfully entered and exited the Capitol Building at three different locations on three different occasions within the span of one hour; (2) the defendant initially chose to enter the Capitol after having witnessed unmistakable signs that the mob was engaged in a violent riot; (3) as he entered the Capitol, the defendant incited others to press deeper into the building; (4) while inside the Capitol, the defendant joined a large group of rioters in the Rotunda, and pushed some of those rioters towards officers who were trying to clear the area; (5) later that afternoon, the defendant positioned himself near the Lower West Terrace tunnel while officers were actively engaged in a physical battle with rioters, and he repeatedly shone a strobe flashlight in the direction of officers; (6) the defendant later boasted in a text message that he "literally blinded the cops as the proud boys kicked in the door"; and (7) that evening, the defendant posted on Instagram video segments that he had recorded that day, in which he, among other things, cheered on other rioters and vowed, "You are never stopping us!  You criminals!  You'll never stop us!"

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  *See United States v. Thomas Fee*, 21-cr-131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution.  And that assault was intended by many and by the mob at large in general to interfere with an important democratic process[] of this country.  I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates).  But for the defendant's actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 21-cr-54 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers.  The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification – combined with his repeated entries into the Capitol, his conduct inside the Capitol, and his decision to assist other rioters who were engaging in physical confrontations with law enforcement – renders a meaningful jail sentence both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### A.   The January 6, 2021 Attack on the Capitol

To avoid repetition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 31 (Statement of Offense), at 1-3.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.  Before turning to the defendant's conduct on January 6, we provide additional information about two aspects of the January 6 attack that inform the defendant's role: the rioters' initial breach on the West Front of the Capitol grounds and the attack on the tunnel leading to the doors of the West Front of the Capitol Building.

### B.     Breach on the West Front of the Capitol Grounds

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the Capitol Building on January 6, 2021, possible. The outer perimeter of the Capitol Grounds, made up of bicycle-rack and other similar fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]"  These fences were not actively manned, but members of the Capitol Police were stationed nearby as well as patrolling

throughout the grounds.   At approximately 12:45 p.m., a crowd began to gather against the

barricades near the Peace Monument, which led to the Pennsylvania Walkway:[2]



Seeing this, a half dozen Capitol Police officers began to gather behind what is labeled in the

diagram above as Area A.  At 12:52 p.m., the first breach of the outer perimeter occurred, with

several members of the crowd jumping over and pushing down the unmanned bicycle-rack

barricades at the Peace Circle and advancing into the restricted area to engage with Capitol Police

officers at the first manned barrier.  Less than a minute later, with the crowd already numbering in

the hundreds, the handful of Capitol Police officers in and around the barrier were shoved out of

the way by the mob.  By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down

---

[2]        The diagram above is an open-source rendering of the Capitol Building and Grounds as
they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.

the Pennsylvania Walkway and overwhelmed the second manned police barrier, marked as Area B in the diagram above.  They flooded the area labeled "Lower West Plaza" (or Area C), pushing against the barricade there.  Security footage from the Capitol Police's closed-circuit video system displays the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with Capitol Police officers at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right):



The crowd then quickly pushed through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza.  Specifically, as shown below, the breach of the West Plaza barricades (top left) was followed by the formation of a Capitol Police officer wall (top right) until Metropolitan Police Department officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left) and temporarily contained the crowd behind it.





After former President Trump finished his speech at the Ellipse at approximately 1:15 p.m., the crowd began to grow even more rapidly. At 2:03 p.m., Metropolitan Police Department officers responding to Capitol Police officers' calls for help began broadcasting a dispersal order to the crowd. The mob in the restricted area, however, continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them. By 2:28 p.m., several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With the officers' defensive lines extinguished, there were now no manned defenses between the crowd and several entrances into the Capitol Building.





*B.     The Attack on the Tunnel Leading*
*to the Doors of the West Front of the U.S. Capitol Building*

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace.  The entrance usually consists of a flight of stairs leading to a doorway.  On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.  That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.  The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.   This archway has been the backdrop for nine presidential

inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and

other dignitaries on Inauguration Day.[3]



On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of

doors was closed and locked, and members of Congress were sheltering nearby.  Capitol Police

officers, assisted by officers from the Metropolitan Police Department, were arrayed inside the

doorway and guarding the entrance.  At approximately 2:42 p.m., the mob broke the windows to

the first set of doors.  The officers reacted immediately by spraying Oleoresin Capsicum ("OC")

spray at the rioters, who continued to resist.  The mob continued to grow, and the rioters pushed

their way into the second set of doors, physically engaging law enforcement with batons, poles,

chemical spray, bottles and other items.  Officers created a line in the doorway to block the rioters

and physically engaged them with batons and OC spray.

---

[3]      The photograph in the text is available at Architect of the Capitol, *Inauguration at the U.S. Capitol*, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

The violent and physical battle for control over the Lower West Terrace entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.  The battle involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of Metropolitan Police Department Officer Michael Fanone and the assault of Officer Daniel Hodges.  During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them.  Several officers sustained injuries during this prolonged struggle.  Still, many of them returned to defend the Capitol, even when injured.  The officers also provided first aid to injured rioters who were trapped in the tunnel area.

     D.     *Christopher Ortiz's Role in the January 6, 2021 Attack on the Capitol*

On January 4, 2021, Ortiz, an amateur photographer and a freelance production set assistant, traveled by train from his hometown in New York to Washington, D.C., to attend and take photographs at the "Stop the Steal" rally scheduled to take place on January 6.

     1.     <u>Ortiz's Approach to the Capitol's Restricted Grounds</u>

In the morning of January 6, 2021, Ortiz went to the Ellipse to attend former President Trump's planned speech and rally.  After former President Trump encouraged attendees to bring their protest to the Capitol, Ortiz made his way to Pennsylvania Avenue and then rushed toward the Capitol to get ahead of the large crowd.  Ortiz entered the Capitol's restricted Grounds well before 2:30 p.m.  By the time he reached the Capitol's Upper West Terrace, Ortiz had seen first-hand that the protest had turned violent.  He saw at least one individual with a broken leg.  He saw law enforcement attempting to disperse rioters with pepper spray and tear gas.  He saw rioters climbing up the stand set up outside the Capitol in preparation for the January 20, 2021,

Inauguration, and he saw rioters breaching the Capitol Building.  And, at approximately 2:32 p.m.,

Ortiz took a video on his cell phone of a man scaling the Capitol Building:



In the video – which Ortiz later posted on Instagram – Ortiz can be heard celebrating when the

rioter reached an exterior balcony, "Yeah! Yeah!"  Ex. 1 (0:39 – 0:53).[4]  In another video, which

---

[4]      All video exhibits cited in this memorandum have been lodged with the Court via USAfx.
A corresponding notice is being filed in the docket contemporaneously with this memorandum.

Ortiz also included in his Instagram posting, Ortiz cheered as rioters approached an entry point near the Northwest Courtyard: "Yeah!  We're at the door!  We're at the door!"  Ex. 1 (0:53 – 1:00).

    2.  <u>Ortiz's Repeated Entries into the Capitol Building</u>

Between 2:47 p.m. and 3:23 p.m., Ortiz entered and exited the Capitol Building on three different occasions.  At approximately 2:47 p.m., Ortiz entered the Capitol for the first time. He did so through the Parliamentarian Door, on the west side of the Senate Wing – an entry point that had been forcibly breached only minutes earlier by a mob who overran officers in riot gear:





Parliamentarian Door at 2:42 p.m.            Parliamentarian Door at 2:47 p.m.

As Ortiz marched inside with other rioters, he recorded the scene on his cell phone.  In the resulting video, which Ortiz once again included in his Instagram posting later that day, Ortiz can be heard yelling, "Onward! Onward!"  *See* Ex. 1 (1:14 – 1:22).  Ortiz then exited the Capitol Building for the first time at approximately 2:55 p.m., again through the Parliamentarian Door.

At approximately 2:58 p.m., Ortiz reentered the Capitol Building through the nearby Senate Wing Door.  Ortiz then turned right and marched southbound through the Crypt and, after that, to the House Wing of the Capitol.





Ortiz exited the Capitol for a second time at approximately 3:02 p.m., through the House Wing Door.



At approximately 3:23 p.m., Ortiz reentered the Capitol Building yet again, this time through the Rotunda Doors on the east side of the building:



He then walked through the entry hall that connects the Rotunda Doors to the Rotunda, joining a large group of rioters who were congregating in that area. At that point, several rioters were resisting officers' efforts to clear that area of the Capitol Building. Ortiz approached the melee, pressed forward, and pushed against some other rioters towards the officers who were trying to clear the area:

13





*See* Ex. 2 (3:23:50 p.m. – 3:24:40 p.m.); Ex. 3 (3:22:48 p.m. – 3:24:55 p.m.).  Ortiz then turned around and exited the Capitol Building, again through the Rotunda Doors, for a third and final time at approximately 3:25 p.m.

    3.   <u>Ortiz's Participation In The Lower West Terrace Violence</u>

    About 90 minutes after joining the melee near the Rotunda Doors, at approximately 4:50 p.m., Ortiz positioned himself near the Lower West Terrace, where officers were actively engaged in a physical battle with rioters.  *See, e.g.*, Ex. 4.  Standing only a few feet from the struggle, Ortiz repeatedly held up a flashlight over the course of several minutes – a flashlight that, according to Ortiz's later statements to the FBI, he had brought to Washington, D.C. as a "deterrent in case he was assaulted at night" – and repeatedly shone it in the direction of officers, using the flashlight's strobe function.







*See* Ex. 5 (0:06 – 1:55), Ex. 6 (0:25 – 1:23).  Security footage from the Capitol Police's closed-circuit video system captures the flashlight's blinding effect on the officers in the tunnel, who were battling to protect the key Lower West Terrace entry:



*Compare* Ex. 7 (at 4:51:11 p.m.), *with* Ex. 6 (at 1:03).   In addition, while on the Lower West Terrace, Ortiz recorded, at close range, video footage of rioters battling law enforcement near the tunnel leading to the doors of the West Front of the Capitol Building.



Ex. 1 (2:57 – 3:05).  He later posted that footage on Instagram as well.  *Ibid.*  Ortiz ultimately left the Lower West Terrace after the officers deployed tear gas, which, as Ortiz later told the FBI, caused him to "almost pass out."

*Ortiz's Response to the Riot and Texts about the Attacks*

In the hours and days following the January 6, 2021 attack, Ortiz did not manifest any regret over his participation in the riot.  In a video Ortiz recorded in the late afternoon of January 6, he can be heard yelling, "You are never stopping us!  You criminals!  You'll never stop us!"  Ex. 1 (3:05 – 3:12).  That same day, Ortiz also boasted in a text message, "I literally blinded the cops as the proud boys kicked in the door."

As noted, on January 6, Ortiz also posted footage he recorded at the Capitol on Instagram.  Ex. 1.  The resulting Instagram story captures Ortiz as he celebrates a rioter climbing an exterior wall of the Capitol Building ("Yeah! Yeah!"); as he boasts about reaching the Capitol's doors ("Yeah! We're at the door! We're at the door!"); as he incites other rioters to move deeper into the Capitol's halls ("Onward! Onward!"); and as rioters battle police officers near the Lower West Terrace tunnel.  When an acquaintance expressed concern over Ortiz's presence at the Capitol, Ortiz responded, "It was a lot of fun."  In another Instagram direct message with the same person, Ortiz downplayed his conduct as "participating in government."  He later added, "I'd storm the Capitol for you any day." He also boasted, "[M]y story is better than anything Netflix is putting out so enjoy the show!"  He claimed, "[I don't know] if China stole the election but I know they are an evil communist government that's literally committing genocide.  So my hand has been forced."  He dismissed the consequences he may face, "Lol they can come and get me; I didn't break or vandalize or steal; I walked through and out."  And he stated, "Those cops have it coming too."

In the evening of January 6, another individual texted Ortiz, "What a crazy piece of history to be a part of."  Ortiz responded, in a string of Instagram direct messages, "Hell yeah! … Wait till the sun goes down. … This shits gonna be nuts."  Ortiz later told the same individual, "I'm

very happy I'm not in the footage[.]  I was wearing all black and had my camera so hopefully they look at me as press."  Nor did Ortiz rethink his conduct in the days following January 6.  On January 9, in response to a message asking why Ortiz joined the riot, Ortiz responded, "It was pretty epic."

*Ortiz's Interview*

As part of the plea agreement in this case (*see infra*), Ortiz agreed to an interview with the FBI.  That interview took place on May 26, 2022.  Among other things, Ortiz told the agents that, during the attack, he shone his flashlight at law enforcement as they were battling other rioters in the Lower West Terrace tunnel "as a form of protest" after learning of the death of a protestor during the attack.

*The Charges and Plea Agreement*

On January 22, 2021, Ortiz was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On January 27, 2021, he was arrested at his home in New York.  On March 14, 2022, Ortiz was charged by a four-count Information with unlawfully entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); impeding or disrupting the orderly conduct of Government business or official functions, in violation of 18 U.S.C. § 1752(a)(2); engaging in disorderly or disruptive conduct in any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  On March 24, 2022, he pleaded guilty pursuant to a plea agreement to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G): parading, demonstrating, or picketing in a Capitol Building.  Under the terms of the plea agreement, Ortiz agreed to pay $500 in restitution to the Department of the Treasury.

### III.     Statutory Penalties

Ortiz now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).  In this case, as described below, the balance of the Section 3553(a) factors weighs in favor of incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without

authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would, at a minimum, have crossed through numerous barriers and barricades and heard the throes of a mob.  Many, including the defendant in this case, also observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in acts of hands-on violence with law enforcement officers, or had he personally destroyed property, he would be facing additional charges and penalties associated with that conduct.  Accordingly, any absence of such hands-on violence against law enforcement or destructive acts on the part of the defendant is not a mitigating factor in this or any other misdemeanor case, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.  To the contrary, as explained below, Ortiz's assistance to rioters who did engage in hands-on violence against law enforcement – first by pushing rioters

who were pushing against law enforcement officers near the Rotunda Doors, and later by shining a strobe flashlight in the direction of officers as they fought with rioters near the Lower West Terrace tunnel –  makes him stand out as *more* culpable than the vast majority of misdemeanor defendants.

When Ortiz went to the Capitol, he knew that there would be violence. After former President Trump encouraged attendees at his rally to go to the Capitol, Ortiz rushed to the Capitol ahead of the large crowd.  Once there, Ortiz saw attendees being peppered sprayed and tear gassed by law enforcement officers.  He saw (and recorded) rioters climbing up the scaffolding erected outside the Capitol for the Inauguration scheduled to take place on January 20, 2021.  He saw people actively agitating the crowd, causing more hostility. He saw other rioters breaching the Capitol.  He saw at least one rioter physically injured, with a broken leg.  He recorded a video of a man scaling the outside wall of the Capitol Building.  And he saw fellow rioters breaking the windows of the Capitol Building.

Having witnessed this mayhem, Ortiz nonetheless entered the Capitol, through a door in the Senate Wing near the parliamentarian's office.  Significantly, Ortiz did so less than 5 minutes after rioters first breached that entry point – something that Ortiz undoubtedly realized as he had been standing outside and triumphantly cheering, "We're at the door!" While no police officers blocked his path, the signs of the rioters' violent entry were unmistakable.  Ortiz would also have heard the alarm sounding throughout the Capitol: a loud, high-pitched, continuous beeping, similar to a smoke alarm.  And he was aware that tear gas had been deployed.

Once inside the Capitol Building, Ortiz did not reconsider his actions in view of the lawlessness around him.  Instead, he entered and exited the Capitol three separate times.  He first spent several minutes walking around the Senate Wing near the Parliamentarian Door.  He then

reentered through the Senate Wing Door and marched through the Crypt and into the House Wing, exiting on the west side of the building.  Minutes later, he reentered – this time from the east side of the Capitol – through the Rotunda Doors.  Once inside, Ortiz pushed other rioters as they were pushing back on a line of police officers who were attempting to regain control of that side of the Capitol.  Ortiz's repeated entries, the considerable amount of time he spent inside the Capitol, and his participation in the confrontation with law enforcement near the Rotunda Doors underscore his intent to join in a violent riot.

Ortiz's conduct later that afternoon was even more appalling.  After exiting the Rotunda Doors at approximately 3:23 p.m., and despite ample opportunity to reflect on the unfolding riot and return to his hotel room, Ortiz did not leave the Capitol Grounds.  Instead, he positioned himself near the Lower West Terrace tunnel.  There, he stood only feet away from one of the most violent and chaotic physical battles that took place between law enforcement and rioters on January 6.  But Ortiz was no mere spectator to the mayhem.  Ortiz grabbed the one combat tool he had brought – a flashlight[5] – and repeatedly shone it at the officers, using the flashlight's strobe function, in an attempt to blind the officers who were attempting to hold the line against the mob's attacks.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Ortiz has no prior criminal history.  Ortiz also reported to the Probation Office that, since 2020, he has been working as a freelance production set assistant.

---

[5]     In his May 26, 2022, interview with the FBI, Ortiz claimed that he brought the flashlight to Washington, D.C., as "deterrent in case he was assaulted at night."  But Ortiz brought that flashlight with him to a rally (and then a riot) that took place in broad daylight.  Moreover, the fact that Ortiz brought the flashlight to Washington, D.C. confirms that, by the time he left New York on January 4, 2021, Ortiz already knew that there was a high risk that the protests in Washington would turn violent, but was not deterred.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238 (TFH), Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes

---

[6]     Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed.  When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.  The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.  It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was [before January 6, 2021] for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see also United States v. Thomas Gallagher*, 21-cr-41 (CJN), Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry.  Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society.  Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing); *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country.  That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188 (RDM), Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First

Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters – especially those who intend to improperly influence the democratic process – that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Ortiz's statements after the January 6 attack separately demonstrate a clear need for specific deterrence in this case.  In the evening of January 6, Ortiz bragged in a text message, "I literally blinded the cops as the proud boys kicked in the door."  That evening, Ortiz also posted an Instagram story that combined the video he recorded at the Capitol throughout the day. *See* Ex. 1. He boasted in another message that his Instagram story was "better than anything Netflix is putting out so enjoy the show!"  He reflected on his day as "a lot of fun" and "pretty epic."  He downplayed his conduct as "participating in government" and blithely told an acquaintance, "I'd storm the Capitol for you any day." He dismissed the potential consequences of his actions, "Lol they can come and get me; I didn't break or vandalize or steal; I walked through and out."  And he turned blame on the law enforcement officers who tried to protect the Capitol on January 6: "Those cops have it coming too."

To be sure, Ortiz has admitted, by pleading guilty in this case, that he violated the law on January 6, 2021.  Nonetheless, the gravity of his conduct at the Capitol, his casual (and false) downplaying of  that conduct ("Lol they can come and get me … I walked through and out"), and his apparent refusal to acknowledge the extent of his own lawlessness while blaming others for his actions that day, from the Chinese government to police officers ("those cops have it coming too"), underscore the need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[7]  Each offender must be sentenced based on his or her individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.  A probationary sentence should not become the default.   As Judge Lamberth has admonished, "I don't want to create the impression that probation is the automatic outcome here because it's not going to be."  *United States v. Anna Morgan-Lloyd*, 21-cr-164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 21-cr-97 (PLF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect … 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.'  And I agree with that.  Judge Hogan said something similar.") (statement of Judge Friedman).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences – such as how and how many times a defendant entered the Capitol, whether he incited others, what areas he reached inside the Capitol building, what he did in those areas, the nature of any statements he made (on social media or otherwise) since January 6, 2021, etc. – help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a

---

[7]      Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

defendant's "record" and "conduct" but other relevant sentencing criteria, such as a defendant's manifestation of genuine remorse.

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69-71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences.").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g.*, *United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-1344 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses are an appropriate group for purposes of measuring disparity of any future sentence.

The Court may consider, for reference, the sentence of Adam Avery Honeycutt. *See United States v. Honeycutt*, No. 22-cr-50 (CJN). On March 1, 2022, Honeycutt pleaded guilty to parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), the

same charge to which Ortiz pleaded guilty in this case.  Like Ortiz, Honeycutt made his way to the Lower West Terrace, where some of the worst violence committed by rioters against the police occurred.  Like Ortiz, Honeycutt helped the rioters who were violently battling police in the Lower West Terrace tunnel – Ortiz by attempting to blind the officers with a flashlight and Honeycutt by passing a long wooden plank to other rioters.  Finally, like Ortiz, Honeycutt posted images of confrontations between rioters and law enforcement on social media.  Unlike Honeycutt, however, Ortiz also made multiple re-entries into the Capitol.  And unlike Honeycutt, Ortiz supported other rioters' violent confrontations with law enforcement officers inside the Capitol – near the Rotunda Doors.  At a sentencing hearing on May 11, 2022, Judge Nichols sentenced Honeycutt to 90 days' incarceration, to be served consecutively to an 18-month sentence that Honeycutt received on separate firearm and drug charges in state court.  Ortiz should receive a sentence that is no less severe – and, indeed, substantially *more* severe – than Honeycutt's.

The Court may also look to the case of Annie Howell, which presents some similar facts, albeit without some significant aggravating factors present in this case.  *See United States v. Howell*, No. 21-cr-217 (TFH).  On December 2, 2021, Howell pleaded guilty to entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1).  Like Ortiz (and like Honeycutt), Howell was present during the fighting on the Lower West Terrace, posted videos on social media, and later sought to minimize her involvement in the riot.  Unlike Ortiz, however, Howell did not exit and reenter the Capitol Building on multiple occasions and did not assist other rioters who were fighting against the police.  At a sentencing hearing on March 2, 2022, Judge Hogan sentenced Howell to 60 days' incarceration and 36 months of probation.  The government's 5-month recommendation in this case reflects the similar – but substantially more serious – conduct at issue here.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently – differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence" – "a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted) – for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *United States v. Sarko*, No. 21-cr-591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21-cr-342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22,

30

2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB), ECF 46 (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, 21-cr-607 (EGS) (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Blakely*, 21-cr-00356 (EGS) (D.D.C. July 14, 2022); *United States v. Ticas*, 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022). In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### A. A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment").  Two provisions – one from subchapter A and one from subchapter B – are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[8] followed by a term of probation.

---

[8]     A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10).  *See* Part B *infra*.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[9] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless … (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment … at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section

---

[9]     Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless … the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2.  *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose … to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-761 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless … the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight

imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Section 3561 "begins with a grant of authority" – permitting a court to impose probation – followed by a limitation in the words following "unless." *Little*, 2022 WL 768685, at *4. But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th

ed. 2021) ("A defendant may be sentenced to probation unless he … is sentenced at the same time
to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only
"different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section
3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state
"the same *offense* or a different offense that is not a petty offense," which would imply that the
final modifier – *i.e.*, "that is not a petty offense" – applies only to "different offense." The phrase
"that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated
phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law:
The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a
petty offense" solely to "different offense," the "typical way in which syntax would suggest no
carryover modification" would be some language that "cut[s] off the modifying phrase so its
backward reach is limited." *Id.* at 148-149. And while the indefinite article "a" might play that
role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with
icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article
before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL
768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry
the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty
offenses is sensible because sentencing courts cannot impose supervised release on petty-offense
defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914,
at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty
offense). When Congress in 1994 amended the language in Section 3561(a), it again provided

sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision – through probation – following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented."  *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might

36

be thought to prevail." *Id.* at 185. "The 'specific provision'" – here Section 3561(a)(3) – "does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or

probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could

be sentenced to incarceration and supervision (in the form of probation).  No sensible penal

policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and

probation where, as here, the defendant is convicted of a petty offense.  The defendant pleaded

guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the

Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed

six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d

1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty

offender may face a sentence of up to five years in probation).

### B.  A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

#### 1.  Relevant background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.

Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights,
> weekends or other intervals of time, totaling no more than the lesser
> of one year or the term of imprisonment authorized for the offense,
> during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility"

to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983

WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[10]

### A. Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3563(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[11]

---

[10]    Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

[11]    Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-131.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation.  18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.  Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes imprisonment as a term of probation in the defendant's case given the requested 5-month imprisonment sentence.

## VI.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained above, balancing these factors, the government recommends that this Court sentence Christopher Ortiz to 5 months' of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility through his guilty plea.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ Francesco Valentini
FRANCESCO VALENTINI
D.C. Bar No. 986769
Trial Attorney
United States Department of Justice, Criminal Division
Detailed to the D.C. United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
(202) 598-2337
francesco.valentini@usdoj.gov